Good morning everyone. The panel this morning has the benefit of the participation of District Judge Amy St. Eve from the United States District Court for the Northern District of Illinois located in Chicago, and we appreciate her generous contributions to our work and thank her for doing this overtime work because of course she still has a huge caseload waiting for her back in Chicago, so welcome and thank you. Thank you, Chief. It's a pleasure to be here. We'll hear argument first in In Re CBC Industries Appeal 1598 from 2008. Counsel, good morning to you. Welcome to the court. Good morning, Your Honor. Please proceed. Show us where the board was wrong in your view. May it please the court, I'd like to begin my argument today with an undisputed finding by the board. It's at A5. This is the board's decision denying the appellant's request for rehearing. Steinbach System, that's the Steinbach 899 patent at A261, is designed to eliminate the danger that loose jack bolts which secure rotating parts in machinery, such as roll mill assemblies, will escape. That finding is confirmed in the following paragraph. Steinbach teaches that jack bolts are in danger of loosening and escaping from apparatus used to fasten rotating systems. In other words... How does it help you? It's undisputed, Your Honor, that Steinbach, the prior art, when used in a rotating environment, comes loose. So what? Claim 1. Let's take a look at Claim 1 if we can. Claim 1 of the ALBA 925 patent expressly recites rotation. So we have a defined, undisputed, teaching way in the prior art, teaching a way from using a particular prior art device in a rotating environment. Well, the reference, the Superbolt reference that was applied at page A212 states quite clearly, when properly torqued, Superbolt products will not come loose. Pre-stressed nuts and bolts remain tight on vibrating or pulsating equipment and on constantly reversing loads. That's correct, Your Honor. And that document was from 1985. It was repeated in 1987. What is your point? That the later patent somehow proves that the catalogs in 1985 and 1987 were a lie and therefore can't be relied on as prior art references by the Patent Office? Well, I think a lie is probably a strong term. Marketing puffery is probably a better description, at least in my view. I think a person of ordinary skill in the art in 1999, which is the date in which the ALBA 925 application was filed, would have certainly considered the Steinbeck patent, which is a technical, I mean, Steinbeck wasn't How do you get around at A6 where Steinbeck also says, and the Board adopted, that the apparatus disclosed is extremely effective in performing the function for which it was designed? How do you get around that? Doesn't that defeat your argument? It does not. And this gets to what was the level of skill in the art and the hoisting art. That statement relates to the tension. There is no dispute that Super Bowls create immense axial tension. They are very tight. The question is, for how long? And in 1990, Steinbeck admitted to the Patent Office and the whole world that they don't stay tight for very long in a rotating environment. That was not disputed by the Board. The dispute here is where the Board disqualifies Steinbeck as a teaching away, because the Board believes that our device doesn't operate in a rotating environment. However, if you read Claim 1, it positively recites rotation. The device wouldn't work if it couldn't rotate. It's common sense when these machines are hoisted, they turn. Yeah, but that's not the same as a rolling mill. I don't dispute that. If you carefully review what Steinbeck stated in his 1999 patent, he said it's for moving machinery, moving equipment. Rolling mill was one of several embodiments. It really comes down to rotation. But there's rotation and then there's rotation. There's rotation of a load being held up on a hoist ring, and then there's rotation in a mill. They're not comparable. Well, I would say there's no substantial evidence of that. If that's an issue to take up in the scope and content of the prior article, it was the burden of the Patent Office, not the Court today, to look back and have an opinion that that's a different motion. I'm just trying to evaluate your argument. It has nothing to do with the burden of the Patent Office. It has to do with whether your argument has persuasive force. Well, at the linguistic level, yeah, rotation is true in both situations, but it's a very different kind of rotation it looks like to me. Again, if you read Steinbeck, it really focuses on the vibration. Vibration can be imposed in many different ways, from movement, rotation. There are some embodiments in Steinbeck that are questionable as to whether they move or vibrate at all. But it can't be reasonably disputed that there's vibration, and there's ample record support for that, which I can provide you with, and rotation in the implementations of the invention that's at issue in this appeal. Furthermore, this is an issue of safety. Safety magnifies the teaching way. It's not just some teaching way. Put yourself in the shoes of an engineer. Why aren't there equal safety concerns? If the Steinbeck device is used to hold up suspension bridges, why isn't that as much of a safety issue as when a crane is holding a hoist ring? In either case, if there's a failure, there'll be catastrophically harmful results and injuries. So if safety is equally at play in the two situations, then how are you distinguishing them? Well, I'm trying not to use hindsight. I'm trying to go back in 1999 and take a look at the art objectively as we found it. It may well be that somebody somewhere uses a Super Bowl on a suspension bridge. I don't know whether that's true or not. But a person of ordinary skill in the hoist ring art, who's going to put his people underneath these devices as they're hoisted, would not have been motivated to combine that with a fastener device that undisputedly comes loose in a rotating environment. Now today, you may say, well, in my opinion, that's a different type of rotation. Well, that's an analytic that would require very thorough consideration within the patent office. Didn't the board specifically find that there was no evidence that the heavy loads were subjected to the same type of movement or vibration in Steinbeck? There was a statement of that sort. That's, in my view, why we're here today. There's absolutely no substantial evidence to support that. They just say, well, we think the rotating in Steinbeck is different than the rotating recited in Claim 1. And quite frankly, I don't think a person of ordinary skill in the art in 1999 would have taken that risk. We can't base our disposition of this appeal on your giving your personal opinion at the podium. You're not testifying as a witness. You're arguing from a fixed record as an attorney. I understand, Your Honor. And that's why I started with the undisputed fact that it's been described as rotation and vibration and movement. Let me give you another example. It is stated by the board that Steinbeck comes loose in moving machinery. If you look at my client's marketing materials at A192, it shows at the bottom moving machinery. It shows a hoist moving machinery with swiveling hoist rings that at the top of the page states protects men and material. I just don't think, I think that there's, and the board didn't dispute that there's a distinguishing statement. The board just disputed whether it applied to our particular context. Now I think because this teaching away is safety-ridden, with respect to life and limb, it's magnificent. Doesn't the teaching away concept require calibration? Something might teach away a little bit, weakly, or something might teach away very, very strongly. So the way I read the board here is they felt that if there was even a teaching away at all, it was very weak and not strong enough to overcome the prima facie case of obviousness. Well, first of all, I agree. Teaching away needs to be taken in context. And I believe in safety is an aspect of the teaching away that's magnified. But let's talk about what the board considered to be a weak teaching way. Before you go there, does the ALBA patent even discuss safety? Well... And what should we take from the fact that, I know it's in the title, but it really doesn't discuss. It does not. And to be honest, or to be clear, we don't claim that safety is a claim limitation. No pun intended. It's not a limitation. The focus of the patent is on the architectural structure. But when in the context of an obviousness analysis, it encompasses the scope and content of the prior art, and whether there's, under KSR, either a reason to combine, or the corollary principle, a reason not to. Those, by definition, aren't claim limitations. Here I'm focusing on the connection between... Is safety a factor to consider in obviousness? Yes. In what way? Well, there... Well, if the proposed combination would be unsafe, a person of ordinary skill in the art would not make it. There are Federal Circuit cases holding such. And I can provide you with sites. What the board stated, they cited case law saying safety is not pertinent to patentability under 101. Well, we're not here to discuss 101. This is whether the claim is obvious under 103. No, but the question is whether the references would have taught one of ordinary skill in the art the combination claimed. Do you have at least some substantial evidence to support the conclusions reached by the board? Even though there may be other statements in these references that suggest otherwise, the board nonetheless has substantial evidence on which to formulate its view. And isn't that a burden that's virtually impossible for you to overcome? If you're referring to the... Are all of the limitations there? And was there some reason to put them together? Yes. I don't dispute that. It's not why I'm here today. I'm here to dispute that anybody would have done that. And there's National Steel Car v. Canadian Pacific Railway, a Federal Circuit case that says we have a reference that provides some reason to combine, but the reference nonetheless teaches a way. It teaches a way. You seem to be suggesting that the Steinbrook devices shown in the catalog always fail. That if they had been patented, the patent would have been invalidated because the device was inoperative. But I don't see evidentiary support for the idea that the super-volt, multi-volt devices always failed or ever failed. There was an expressed concern that under certain circumstances they might start to come loose, and if they all came loose and came entirely loose, there would be a problem. But that's not the same as saying this system just doesn't work, it always fails, it always comes apart. That's an excellent observation, Your Honor, and that's where I started when I began looking at this arc. There's a refinement. In the hoist ring arc, let me back up, in the Steinbeck arc, there are only tensile forces. Forces go up and down. And I'm not sitting here today saying the Steinbeck super-volt is separating and the machines are just spiraling out of control. That's the fastener arc. In the hoist ring arc, there are axial forces and shear forces. It's more complex, and it's in the briefing. If you look at A192, it shows the vertical and the side shear force. It's not a problem Steinbeck deals with. When a bolt or two or three, we don't know how many, which is another issue, comes loose, it's not that it separates in the axial sense and the load falls to the ground. It's that all of the shear force is focused on the shank, and it snaps. It's a catastrophic failure. So I'm not saying Steinbeck didn't work. Steinbeck didn't have people underneath the rolling mill. Steinbeck wasn't concerned about life and limb. We are. But there's some physics at play here. Thank you. Was there evidence submitted to the board by declaration about unexpectedly good results or problems no one else could solve after great effort and so forth? Well, I'm running out of time. I want to answer your question. Unexpected results. The invention is premised on the proposition that against conventional wisdom, you can use these devices and they don't fail. I'm just asking what the evidence was before the board. Did you submit secondary consideration evidence? Yes.  Beyond just sales? I'm sorry? Beyond just sales? Any evidence of unexpected results? Yes. The evidence of unexpected results, yes. We have the Alba Declaration, which is the declaration of the inventor, stating that contrary to the expectation that the plurality of jackbolts would come loose, they don't, and their products have been successful, not just physically but commercially. Are you waiving or forfeiting these arguments about secondary consideration because you really give very little attention to them, I think just a sentence or two in your opening brief and you don't address them at all in your reply? Your Honor, I won't say we're abandoning them. Probably not our strongest argument today. Let's hear from the government and we'll restore your rebuttal time of three minutes. Thank you. Ms. Lynch, good morning to you. Welcome to the court. You heard what was said by Mr. Leroy, so tell us where you think he's wrong. Your Honor, I'd like to start by, why don't we go directly to Steinbach because that's where he starts from and look at the 889 patent. Let me explain why it doesn't teach away. If you look at Steinbach on A267, column 2, starting at line 29, it says that the apparatus is extremely effective in performing the functions for which it was designed. Yeah, he read that same language to us. Correct, Your Honor. So that teaching alone is evidence that Steinbach works. Yeah, but his point is, yes, it works in suspension bridges, but not in hoist springs. But there's no evidence of that, Your Honor, and what the board correctly found was that there's no showing that the motion in hoist springs is the same as the motion in Steinbach. Even if it was... I mean it's different. It's different then, yes. Even if it was, Steinbach only talks about an occasional bolt loosening. It's not like bolts loosen all the time. He just says it occasionally happens. And Steinbach would not have been creating a safety device if he felt that his product didn't work and didn't fasten and was always failing. So Steinbach isn't... Well, we're not interested in the intent of Steinbach. We're interested in what ordinary hoist spring designers would have made out of the combination of SUI and the Steinbach references from the catalog. Correct, Your Honor. And in the light of whatever else the artisans knew. He says, well, they knew that shear forces are a big problem and that Steinbach doesn't deal with that at all, and therefore they'd be cautious or opposed to following the Steinbach multi-bolt pathway. And if he's saying that what scares them away or teaches away from Steinbach is occasional bolt loosening, then I'd like to look at their catalog, which is CBC's own catalog at A193. And this is the catalog that's describing the SUI prior art hoist ring. And what that says in the safety note is, some loosening may develop after prolonged service in a permanent installation. It is advisable to periodically retighten the mounting screw to maintain the specified torque value. And on the next page, on A194, number 7, it says the same thing. Torque should be checked periodically as bolts could loosen in extended service. So people in the hoist ring art knew that bolts could loosen. No one says that SUI was unsafe because bolts could loosen. A skilled worker knew... So you're saying that the danger of loosening is equal, whether it's a single bolt or multiple bolts? Well, I'm saying that I don't know if it's exactly equal, but they certainly... The single bolt also talked about bolt loosening, and they had a way to take care of it. So one of ordinary skill in the art, reading Steinbach, and saying, well, they can occasionally loosen even under something different, under different vibration. That would not be a teaching away because they know that these bolts can loosen. And the way to take care of that is to check and tighten. And I guess you could add that in the Steinbach system, it's even easier to tighten them because it can be done by hand with a wrench by a person instead of by a powerful machine. Correct, Your Honor, and that's why, you know, one of ordinary skill would have turned to Steinbach because it particularly solves the problem that Alba said he was trying to solve, was to get away from these heavy machinery, the hydraulic tensioning, and find an easy way to torque things up. Was the board's reference to Peterson 305 sufficient? Yes, Your Honor, I believe... And why? There's one reference only. I know it didn't come up in Petitioner's argument, but he does make a lot of it in the briefs. And the board only references it once in connection with Steinbach. Why is that sufficient? I believe it's sufficient, Your Honor, because the Peterson, it's the same argument. It's the bolt-loosening argument. And according to Peterson, if we turn to A275, Peterson only talks about bolt-loosening once in Column 1, and he's talking about when you put gauges on the shank, that you should tighten the elements to prevent accidental loosening with attendant danger. So Peterson is just saying, make sure you tighten it so it doesn't loosen. So are you saying we should assume that what the board said about Steinbach is the same for Peterson? I believe, Your Honor, that their discussion of bolt-loosening would cover Peterson as well. In their reply brief, now they point to this routine checking language in Peterson for the first time. That's on A276, Column 4, Line 14, where it says, routine checking of the gauge to see whether it will rotate freely will indicate whether additional tightening of the jack bolts is required. But again, that's exactly the same that they were doing with Sue in their own case. What is the function of the gauge? The function of the gauge, I guess, is for them to be able to determine whether it needs to be torqued. So it measures somehow the tension in the current setting of an individual bolt. Correct, Your Honor. And then, just to talk briefly about the long-felt need, what the board found on that, actually, was that there was no long-felt need, that people were happy with the suing device, they were satisfied with them. So there was nothing in the declaration. The board fully considered the declarations, but it didn't find that it was probative on that. The declarations were all from the inventor himself? No, there were three declarations. One was from Alba, the inventor. One was from Suey, the inventor of the prybar and the hoist ring. And then two were from Mr. Stranahan, which is also a CBC employee. So what do you make of the other two? The Stranahan focused more on commercial success, and the board explained why that was deficient. It never showed a nexus. He never explained that anybody had bought it for that reason. The Suey, he never said that his device was unsafe. He didn't corroborate Alba on the things that Alba said. Did the board make a finding that Alba, on that point, is just not believable? On the point of specifically what, Your Honor? The safety issue. No, the board considered the safety issue, but it explained why it thought Steinbach dealt with a different type of motion, and it also explained that safety wasn't a claim limitation. So the board considered what he said, but it didn't find it persuasive to prove non-obviousness. So it had nothing to do with credibility? It just didn't have probative force, even though it was accepted as being true for what it represented? Well, the board did mention that, you know, parties that it would be slightly skeptical whether or not a party was interested or not, but it fully weighed them, and it discussed the declarations for several pages. Is that tantamount to saying you think that the board accepted what the inventor asserted without discounting it on a credibility ground, but just found the accepted testimony insufficiently probative? That's correct, Your Honor. Didn't the board specifically say it was giving less weight to Alba's declaration because he was an interested party? The board did say that it was somewhat skeptical of it, but he also went through what Alba said. Correct. I'm not saying the board didn't consider his declaration, because I think it's very clear from all the sites that the board did consider it. Do you think the board would be entitled to discount, let's say, by 50% the force of a declaration purely because it's submitted by an interested party? No, Your Honor. I don't think you can put any number on it. I think you have to see… Well, how about 1%? In other words, why should the board at all discount a declaration on the grounds that its author has an interest in the outcome? I think what the case law says, Your Honor, which we cited some of the cases in our brief, I think it says that consciously or unconsciously someone who has an interest in something may be saying things differently than if they were completely objective, and a court is allowed to consider that. Some people wonder if anybody is completely objective. Well, that's correct, Your Honor, but certainly CBC employees… It may be that an inventor has a greater potential conscious or unconscious bias than other declarants, but the idea that some declarants have 100% credibility because they have zero risk of bias is probably a stretch. I think you're right, Your Honor. I think that's what courts do. They look at credibility as a whole and take everything into account. Is the question whether a declaration from an interested party should be discounted in some way, or is the question really more of whether that declaration because of the interest is deserving of perhaps stricter scrutiny? I think the way you said it, Your Honor, is deserving of stricter scrutiny, and I think that's what the board did. They took into account and they weighed it fully and they… didn't necessarily discount it, but just recognized that it was a declaration of an interested party and therefore looked at it with a, shall we say, a more careful eye. That's correct, Your Honor. That's how you're interpreting their use of the word skeptical? Yes, Your Honor. I don't think the board actually used the word skeptical. What was the language the board used on this point? Well, at A26, at the bottom of A26, it says, we might speculate that persons having ordinary skill in the art would have been less skeptical, so maybe that's correct, so they did use the word skeptical. But do you think it's properly interpreted, as Judge Lynn suggests, that it just means to look at it closely, not that you automatically discount it by some portion? That's correct, Your Honor. So if the court has no further questions, I'd ask you to affirm the board's finding. Now, the board never sees the declarants, right? That's correct. So if the board were to make a credibility finding and say, well, so-and-so declarant, not in this case, just hypothetically, we think he's lying. We think he's just not telling the truth. We don't believe a word the guy says. Would there be a problem with that since the board never laid eyes on the declarant? I can't imagine the board saying that, Your Honor, so I'm having a hard time with that.  If they had good reasons to say why what the person said was contradicted elsewhere, that would be okay. Does the board ever make credibility findings? I can't remember anything that looked like a district court credibility finding in the face of declarations, whether by inventors or third parties. In all of these cases, we get 50 or so of your cases every single year. I don't remember there ever being what really looked and smelled like a credibility finding by the board. I think that's probably correct, Your Honor. But again, I don't think that that's what they did here. I think they just took into account who each of the declarants were. And are you saying they took it in account in the context of all of the evidence that was presented? Yes, Your Honor, and they specifically noted where Sui didn't corroborate what the other CBC people said. I understood Mr. Leroy to suggest that I guess it's in the patent itself. There's some reference to the challenge presented by sheer forces as opposed to tensile directed forces, longitudinal forces, I suppose we could call them. Is that your reading of the patent? I think hoist rings do have both of those forces applied to them, but again, I think that just explains more clearly why the Steinbach reference doesn't teach away, because Steinbach was talking about completely different motion and vibration in forces. But specifically with regard to sheer forces, does the board deal with the issue of hoist ring arc confronting both longitudinal and sheer forces, whereas some other comparable arc might only face the one type of force or the other, but not both as the hoist ring apparently does? The board didn't specifically address that. They just explained why the motion was not, why CBC had not shown that the motion in Steinbach would be comparable to the hoist ring motion. Anything further? No, Your Honor. Thank you. Counsel, we've restored your three minutes. No need to repeat anything said earlier, but if there are new points in response to what Ms. Lynch has said, feel free. Thank you, Your Honor. Ms. Lynch led off with disqualifying our safety, the safety issue we raised stating that Steinbach is something effective, that is undisputed. I would go so far as to say it was an error of law for the board to consider that. It was error of law for the board not to consider the actual rebuttal argument presented. The rebuttal argument presented was not that Superbolts aren't strong. The rebuttal argument presented was that Superbolts come loose. So to disqualify that with the undisputed response that they're strong, tight, is just simply not relevant. Was there evidence that Superbolts come loose more easily than SUI single bolts? There was no discussion of that, Your Honor. I know the physics as to why that's not true. First of all, jack bolts are individually torqued with less torque. That's the whole point. So the frictional forces between the threads in the jack bolt and the threads to which they're threaded into is lower. There's no nut. There's no high tensile force vis-a-vis the threads. Jack bolts are notorious for coming loose in the mechanical engineering world, in any environment, but that's my opinion.  How do you respond to the part of the record that Ms. Lynch pointed out, page 194, paragraph 7? Your own client's device. It says mounting screws should be tightened to the recommended torque. Torque should be checked periodically as bolts could loosen in extended service. That seems to be a reflection of the fact that even the invention in question may suffer from the same loosening. It's sort of inherent in that arrangement. It's not a basis to argue a patentable distinction. Steinbach teaches 500-bolt systems, 250-bolt systems. It puts a retainer on every single bolt. Steinbach even teaches that you tension, you torque every single one of those to the appropriate torque and they still come loose. To the extent there was a preexisting issue in the art, you'd be magnifying it by 250 times. Steinbach never teaches we only have to put retainers on some but all. The point in the declarations and the point in the briefing is that the problem with loosening is magnified with a combination of a superbolt. Let me clarify one thing. The retainers that Steinbach talks about, that's in the 889 patent, right? That's right. But in the product shown in the cited prior art reference catalog, were there retainers on those bolts? No. And that came in 85, and Steinbach in 90 says there was an advancement in the art, this recognition that they come loose even when they're equally tensioned. Final point, Your Honors. Ms. Lynch makes reference to the occasional failure, which is tantamount to the parachute that occasionally doesn't open. And to avoid hindsight, I ask the Court, please go back in time to 1999, put yourself in the shoes of a mechanical engineer, and ask yourself, would you design a safety hoist ring that rotates with the teachings of this record that state rotation causes them to fail? All right. Thank you. We thank both counsel. We'll take the appeal under advisement.